UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **TONYA T. JACKSON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-839-RLB** |
| **CAROLYN COLVIN,<br>COMMISSIONER OF<br>THE SOCIAL SECURITY<br>ADMINISTRATION** | |

**RULING AND ORDER
DISMISSING SOCIAL SECURITY APPEAL**

Tonya T. Jackson (Plaintiff), seeks judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner), pursuant to 42 U.S.C. § 405(g), denying Plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. (R. Doc. 1). Having found all of the procedural prerequisites met (Tr. 1-5), the Court has properly reviewed Plaintiff's appeal. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 ("The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you . . . file an action in Federal district court . . . ."). For the reasons given below, the Court **ORDERS** that the decision of the Commissioner be **AFFIRMED** and Plaintiff's appeal be **DISMISSED with prejudice**.

I.  PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security income alleging that she became disabled on September 2, 2012[1] because of sleep apnea, systemic lupus erythematosus (SLE), autoimmune hepatitis, "HEP" and diabetes. (Tr. 60, 143-56).

---
[1] Plaintiff later amended her alleged onset date to March 2, 2012. (Tr. 233).

Plaintiff's applications were eventually denied by an Administrative Law Judge (ALJ), who first held an administrative hearing (Tr. 27-57) before issuing an unfavorable decision on August 6, 2014. (Tr. 14-22).  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on November 4, 2015. (Tr. 1-5).  The ALJ's decision rested as the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. *See* 20 C.F.R. § 404.981.

## II.     STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" in the context of the National Labor Relations Act, 29 U.S.C. § 160(e)).  The Fifth Circuit has further held that substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quotations omitted).  Conflicts in the evidence are for the Commissioner "and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). The court may not reweigh the evidence, try the case de novo, or substitute its own judgment for that of the Commissioner even if it finds that the evidence preponderates against the Commissioner's decision. *See, e.g., Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994) ("This is so because substantial evidence is less than a preponderance but more than a scintilla."); *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988) ("we must carefully scrutinize

the record to determine if, in fact, such evidence is present; at the same time, however, we may neither reweigh the evidence in the record nor substitute our judgment for the Secretary's"); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988) (same).

If the Commissioner's decision is supported by substantial evidence, then it is conclusive and must be upheld. *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000). If the Commissioner fails to apply the correct legal standards, or fails to provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987).

### III.   ALJ'S DETERMINATION

In determining disability, the Commissioner (through an ALJ) works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining his or her burden at each of the first four steps, the burden shifts to the Commissioner at step five. *See Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (explaining the five-step process). First, the claimant must prove he is not currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove his or her impairment is "severe" in that it "significantly limits your physical or mental ability to do basic work activities . . . ." 20 C.F.R. § 404.1520(c). At step three the ALJ must conclude the claimant is disabled if he proves that his or her impairments meet or are medically equivalent to one of the impairments contained in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d) (step three of sequential process); 20 C.F.R. pt. 404, subpt. P, app'x 1 (Listing of Impairments). Fourth, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his or her past relevant work. 20 C.F.R. § 404.1520(f).

If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity, age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ made the following determinations:

1. Plaintiff met the insured status requires of the Social Security Act through March 31, 2016.

2. Plaintiff had not engaged in substantial gainful activity since September 2, 2012.

3. Plaintiff suffered from the following severe impairments: obesity; autoimmune hepatitis, in remission; systemic lupus erythematosus, in remission; and mild obstructive sleep apnea.

4. Plaintiff did not meet or medically equal any listed impairment.

5. Plaintiff retained the residual functional capacity (RFC) to perform sedentary work in low stress jobs — i.e., jobs requiring only occasional decision making and occasional changes in work settings that do not involve production or pace work, such as an assembly line.

6. Plaintiff could no longer perform her past relevant work as an accounts payable clerk or a preschool teacher.

7. Plaintiff was considered a younger individual.

8. Plaintiff had a high school education and was able to communicate in English.

9. The transferability of job skills was not material to the ultimate determination.

10. Considering Plaintiff's age, education, work experience and RFC, there existed a significant number of jobs in the national economy that Plaintiff could perform.

(Tr. 16-21).

## IV.     DISCUSSION

### A.     Weight Given to Treating Source

In determining Plaintiff's RFC, the ALJ thoroughly discussed the record evidence before giving "little weight" to Plaintiff's treating physician, Dr. Jed Morris, who "indicate[d] the claimant is unable to work and that any return to [work] would lead to serious clinical decline in health." (Tr. 20). The ALJ discredited Dr. Morris' opinion because Plaintiff returned to part-time work in February of 2013 without experiencing the "serious clinical decline in health" predicted by Dr. Morris. (Tr. 20).

Plaintiff now argues that the ALJ "failed to follow proper legal standard[s]" when "rejecting" Dr. Morris' opinion. (R. Doc. 11-1 at 6). According to Plaintiff, the ALJ "discredited three [of Dr. Morris'] opinions predicting a clinical decline in Claimant's condition if required to work full-time solely on the basis that her condition did not become symptomatic after she began working a part-time, low stress sedentary job approximately 20 hours per week. The ALJ reason[ed] 'this work activity has not caused any adverse effects.'" (R. Doc. 11-1 at 7); (Tr. 20).

In reaching this conclusion, Plaintiff suggests the ALJ ignored evidence of an increase in "reported symptoms of fatigue" (R. Doc. 11-1 at 7 (citing Tr. 247, 250, 350, 353, 357, 439, 453)),[2] and "a commensurate increase in the severity of laboratory findings[,] including positive ANA with [Anti-DNA (or dsDNA)] antibodies, elevated liver enzymes and elevated sedimentation rate" (R. Doc. 11-1 at 7 (citing Tr. 263, 371, 374, 397, 434, 441-43)),[3] following her return to part-time work in February of 2013. However, after reviewing the evidence cited by Plaintiff, along with the

---

[2] Plaintiff also cites to pages 179, 186 and 447 of the Administrative Transcript. (R. Doc. 11-1 at 7). However, pages 179 and 186 are not treatment records, but rather Plaintiff's Functional Report, completed at the request of the Commissioner; and page 447 is a duplicate copy of the treatment note found at page 439, which is also cited by Plaintiff.

[3] Plaintiff also cites to pages 448-449 of the Administrative Transcript. (R. Doc. 11-1 at 7). However, pages 448-449 are merely duplicates of the treatment notes found at pages 441-443, which are also cited by Plaintiff.

remaining record, the Court finds substantial evidence supports the ALJ's reason for giving diminished weight to Dr. Morris.

To begin, Plaintiff mischaracterizes Dr. Morris' 3 medical source statements as opining that Plaintiff's health would decline and her remission may end upon a return to full-time work. Instead, Dr. Morris issued 3 medical source statements — the first on May 11, 2010, the second on February 11, 2011 and the third on March 19, 2012 — explaining that while Plaintiff's SLE and autoimmune hepatitis were in remission, "pushing her into a work environment would lead to a clinical decline." (Tr. 476) (March 19, 2012 opinion); (Tr. 477) (On May 11, 2010, Dr. Morris opined that "forc[ing] [Plaintiff] to return to work is likely to lead to an exacerbation of her illness" and jeopardize her remission.); (Tr. 335) (On February 21, 2011, Dr. Morris explained: "To maintain a relative clinical remission, it would be advisable not to return to employment."). And so, Dr. Morris' opinion was that a return to any amount of work — even part-time — would jeopardize Plaintiff's remission and cause a decline in her health.

Considering Dr. Morris restricted Plaintiff from working all-together, the ALJ correctly discredited his opinion, as Plaintiff disproved it by actually working part-time without experiencing a decline in symptoms. At the time Dr. Morris opined that working would be harmful to Plaintiff's health in May of 2010, and again in February of 2011, Plaintiff was and had been working part-time at the St. Helena Parish Hospital since 2006. (Tr. 163, 173). Although she left that job in February of 2011 (Tr. 173), her SLE and hepatitis were, according to Dr. Morris, in remission during her employment in 2010 and 2011, as well as after her employment in 2012. (Tr. 335, 476, 477). As such, the ALJ appropriately discounted Dr. Morris' opinion that any amount of work would exacerbate Plaintiff's conditions and jeopardize her remission.

Moreover, the record does not support a "clinical decline," consistent with the one opined by Dr. Morris, following Plaintiff's return to part-time work in February of 2013. Plaintiff suggests

that the record supports Dr. Morris' opinion, as she reported subjective "symptoms of fatigue . . . commensurate" with an "increase in the severity of laboratory findings" that "would be medically expected to produce fatigue," following her return to part-time work in February of 2013. (R. Doc. 11-1 at 7).  Specifically, Plaintiff points to lab results showing a "positive ANA with [Anti-DNA or dsDNA] antibodies, elevated liver enzymes and [an] elevated sedimentation rate." (R. Doc. 11-1 at 7 (citing Tr. 263, 371, 374, 397, 434, 441-43)).

However, 4 out of the 6 lab results cited by Plaintiff do not support a health decline in early 2013, as they occurred in either 2011 or 2012 — years in which Dr. Morris described Plaintiff as being in "remission" (Tr. 335, 476). (Tr. 263) (elevated sedimentation rate of 57 in 2012); (Tr. 371) (lab results from March of 2012 reported only one abnormality—an elevated percentage of monocytes (10.6 outside the 2.2 to 10.1 reference range)—and contain none of the laboratory findings listed by Plaintiff as indicating a decline in her health); (Tr. 374) (January 2012 lab results reported Anti-DNA antibodies at 10, outside of the reference range of 5-9); (Tr. 397) (Anti-DNA antibodies at 12, outside the reference range of 5-9, on October 20, 2011).

The 2 remaining lab results did occur after Plaintiff began working part-time in February of 2013; however, their findings are consistent with the 2011 and 2012 results cited by Plaintiff, as well as the remaining lab results from those years. *Compare* (Tr. 434) (November 15, 2013 lab results cited by Plaintiff show an elevated sedimentation rate of 75), *and* (Tr. 441-43) (lab results cited by Plaintiff are positive for ANA antibodies with elevated Anti-DNA antibodies and show a sedimentation rate of 88 on July 30, 2013), *with* (Tr. 429) (January 10, 2011 – positive for ANA antibodies and Anti-DNA antibodies at 710, well beyond the 80-120 reference range); (Tr. 426) (February 21, 2011 – elevated sedimentation rate of 45); (Tr. 425) (February 22, 2011 – Anti-DNA antibodies at 16, beyond the 5-9 reference range); (Tr. 417) (June 21, 2011 – positive for ANA antibodies and Anti-DNA antibodies at 398, beyond the 80-120 reference range); (Tr. 412) (August

23, 2011 – Anti-DNA antibodies at 357, outside of the 80 to 120 reference range); (Tr. 381) (December 15, 2011 – ANA positive and Anti-DNA antibodies at 180, outside of the 80 to 120 reference range).  As such, the lab results cited by Plaintiff do not demonstrate a "clinical decline" following Plaintiff's part-time employment in February of 2013. (R. Doc. 11-1 at 7).

Plaintiff additionally argues that these "abnormalities" — positive ANA and elevated Anti-DNA antibodies, liver enzymes and sedimentation rate — "would be medically expected to produce fatigue." (R. Doc. 11-1 at 7).  However, she does not cite to any authority supporting her contention that these abnormalities coincide with fatigue or is otherwise inconsistent with the RFC.  Moreover, the mere presence of abnormal findings means little without actual evidence of resulting limitations. *Banks v. Colvin*, 2014 WL 4660847, at *8 (M.D. La. Sept. 17, 2014) ("[I]t is the limitations caused by the impairments and not the diagnoses themselves that matter.").  As discussed below, the record does not support an increase in fatigue beginning in February of 2013.

Plaintiff claims that "she reported symptoms of fatigue" after she began working part-time in February of 2013, but again, she mostly relies on treatment records from 2012. (Tr. 247, 250, 350, 353, 357) (2012);[4] (Tr. 439, 453) (2013).  Moreover, Plaintiff's claim is contradicted by the record.  For example, Plaintiff told Dr. Morris that she "fe[lt] better" and that "no symptoms [were] bothering her" in February of 2013. (Tr. 246).  On June 29, 2013, she similarly told Dr. Dustyn Williams that she "does not have daytime somnolence" and "has not had any difficulty with her lupus . . . in at least the past 5 years." (Tr. 329).  At an appointment on April 10, 2014, Plaintiff likewise denied symptoms of fatigue. (Tr. 459).  The record therefore does not corroborate Dr.

---

[4] Despite intermittent reports of fatigue in 2012, Plaintiff consistently told doctors that she was doing well and often did not complain of fatigue throughout 2011 and 2012. (Tr. 269) (October 2, 2012 – feels well, no new symptoms, does not complain of fatigue); (Tr. 278) (June 7, 2012) (feeling well, no complaints of fatigue); (Tr. 283) (April 5, 2012 – doing well, no complaints of fatigue); (Tr. 375-76) (January 3, 2012 – no complaints of fatigue); (Tr. 348) (November 13, 2012 – no complaints of fatigue); (Tr. 347) (December 27, 2012 – no complaints of fatigue); (Tr. 288) (March 5, 2012 – no complaints of fatigue); (Tr. 383) (November 23, 2011 – reported "no fatigue" to treating doctor); (Tr. 414) (June 21, 2011 – reported doing well, no mention of fatigue); (Tr. 377) (December 15, 2011 – no mention of fatigue).

Morris' opinion that employment would exacerbate Plaintiff's conditions as the record does not demonstrate an increase in symptomology following Plaintiff's return to part-time employment. As such, substantial evidence supports the ALJ's decision to give little weight to Dr. Morris' 2010, 2011 and 2012 opinions. (Tr. 20).

### B.    New Evidence Before the Appeals Council

On April 3, 2014, Plaintiff's counsel sent a letter with an attached questionnaire to Dr. Joseph Nesheiwat, who had recently started treating Plaintiff following Dr. Morris. (Tr. 478-80) (Questionnaire); (Tr. 445-51) (Dr. Nesheiwat's initial treatment notes dated July 30, 2013); (Tr. 37, 39-40) (Plaintiff began seeing Dr. Nesheiwat when her insurance was no longer accepted by Dr. Morris). The letter repeated Dr. Morris' opinions and acknowledged Plaintiff as having achieved a "sustained clinical remission." (Tr. 478-79). However, Plaintiff's counsel incorrectly summarized Dr. Morris' opinion as "repeatedly indicat[ing]" that Plaintiff's "remission would be jeopardized if she were exposed to the rigors and demands of *full-time* work." (Tr. 478) (emphasis added); (Tr. 479) ("Thus, Dr. Morris was of the opinion that her conditions would likely deteriorate if she were employed full time."). After summarizing Dr. Morris' opinion, Plaintiff's counsel asked that Dr. Nesheiwat respond to the questionnaire, which asked only 3 questions — (1) What are Plaintiff's diagnoses?; (2) What treatment has she received?; and (3) Do you agree with Dr. Morris' opinion? (Tr. 479).

On May 21, 2014, Dr. Nesheiwat responded to the questionnaire. First, he indicated that "blood tests with positive serologies indicat[ed] lupus." (Tr. 479). Second, Dr. Nesheiwat listed Aza Thiopene and Steroids, as prescribed treatments. (Tr. 479). Finally, Dr. Nesheiwat seemingly agreed with counsel's characterization of Dr. Morris' opinion, explaining:

> Plaintiff's condition will cause frequent missed work due to her disease and side effects of treatment if she works a typical full-time job. Absences can be expected to be approximately five days per month on average. Physical stress, such as a full time job can be expected to flare her disease.

(Tr. 479-80).  Dr. Nesheiwat additionally commented:

> I agree with this patient's pursuit of long term disability, and because she has failed to go into remission despite years of aggressive treatment.

(Tr. 480).

Although this evidence was available months before the August 6, 2014 ALJ decision, Plaintiff waited until November 6, 2014 to submit Dr. Nesheiwat's questionnaire, along with her request for review before the Appeals Council. (Tr. 239).  Plaintiff has offered no explanation for her delay.  Nonetheless, she now argues remand is warranted because the Appeals Council did not evaluate Dr. Nesheiwat's questionnaire which, according to Plaintiff, casts doubt on the existence of substantial evidence.  Therefore, Plaintiff insists on remand, as this new evidence must be evaluated by a fact-finder below.  The Court disagrees.

To the extent Plaintiff is claiming that the Appeals Council erred in not evaluating the newly submitted evidence, that argument is legally deficient. As this Court has explained on numerous occasions, "nothing in the Act or regulations requires that the Appeals Council provide a discussion of the newly submitted evidence or explain its rationale for denying review." *See LeDoux v. Colvin*, 2015 WL 5636414, at *5 (M.D. La. Aug. 31, 2015); *Whitehead v. Colvin*, 2015 WL 4772311, at *4 (M.D. La. Aug. 12, 2015) (same); *Jones v. Astrue*, 2015 WL 1346244, at *7-8 (M.D. La. March 23, 2015) (same); *Savoie v. Colvin*, 2015 WL 1004217, at *4 (M.D. La. March 5, 2015) (same); *Woodridge v. Colvin*, 2016 WL 4253971, at *6 (M.D. La. July 14, 2016) (same); *Jones v. Colvin*, 2016 WL 4009823, at *4 (M.D. La. July 25, 2016) (same).

To the extent Plaintiff argues the newly submitted evidence is "significant" enough to cast doubt on the existence of substantial evidence, the Court disagrees.  First, the only exam notes Dr. Nesheiwat are dated July 30, 2013 (Tr. 438-40) and December 11, 2013 (Tr. 433).  Aside from these notes and contemporaneous laboratory results (Tr. 434-37, 448-51), the record contains no

other records from Dr. Nesheiwat's treatment.  Based on the treating relationship supported by the record, Dr. Nesheiwat does not qualify as a "treating source" entitled to deference, despite Plaintiff's characterization. *See Clayborne v. Astrue*, 260 F. App'x 735, 737 (5th Cir. 2008) (doctor properly rejected as treating source where "isolated visits" did not amount to an "ongoing treatment relationship" with doctor); *Hernandez v. Heckler*, 704 F.2d 857, 860–61 (5th Cir. 1983) (doctor who only saw claimant twice in a 17–month period was not a treating physician).

Second, the only objective evidence listed by Dr. Nesheiwat as justification for his opinion are lab results that merely support a diagnosis of lupus. (Tr. 479).  But Plaintiff has long been diagnosed with lupus and the existence of that diagnosis does not automatically mean that Plaintiff suffers from the extreme limitations opined by Dr. Nesheiwat. *See Banks v. Colvin*, 2014 WL 4660847, at *8 (M.D. La. Sept. 17, 2014) ("[I]t is the limitations caused by the impairments and not the diagnoses themselves that matter.").  Moreover, Dr. Nesheiwat stated that Plaintiff has failed to go into remission despite a history of aggressive treatments.  However, this statement is contradicted by Dr. Morris' statements that Plaintiff has achieved remission, as well as the record as a whole. (Tr. 329, 335, 476, 477).  In his letter to Dr. Nesheiwat, Plaintiff's attorney even acknowledged that Plaintiff has "achieved a sustained clinical remission." (Tr. 478).

Finally, Dr. Nesheiwat's opinion is inconsistent with Plaintiff's own testimony and the objective evidence of record.  As previously discussed, Plaintiff frequently failed to complain of fatigue upon examination and often reported that she was doing well. *See supra* note 4 and accompanying text.  The laboratory results previously mentioned likewise do not support the alleged increase in symptomology following her return to work in February of 2013. *See supra* Section IV.A.

In addition to the medical evidence, Plaintiff testified that she is "tired," and "need[s] to relax, rest," after an 8-hour workday and "d[oes]n't feel like" doing household chores. (Tr. 38, 44-

45). However, as the ALJ pointed out, a lack of motivation is commonly experienced after a full day of work and is different from a lack of physical ability. (Tr. 45) ("ALJ: But there's a difference in my mind between feeling like it and actually being able to do it. . . . A lot of people are tired after they spend an 8-hour workday."). Moreover, while Plaintiff claimed to suffer from fatigue after a full day of work, she inconsistently told the Commissioner that she often used the following day off to clean the house, go to the grocery store, cook and take her elderly neighbors to run errands. (Tr. 180, 186); (Tr. 38, 43-44). Plaintiff also reported that she goes out to eat, attends church, goes shopping and socializes with guests at her home about 2 to 3 times per week. (Tr. 183).

Considering Plaintiff's reported activities, along with the medical evidence of record, the Court finds that substantial evidence exists to support the ALJ's ultimate decision and that Dr. Nesheiwat's opinion is insufficient to cast doubt on that existence. For the reasons given above, Plaintiff's assignments of error do not warrant relief.

## V.     CONCLUSION

For the reasons discussed above, the Court **ORDERS** that the decision of the Commissioner be **AFFIRMED** and that Plaintiff's appeal be **DISMISSED with prejudice**.

Signed in Baton Rouge, Louisiana, on February 16, 2017.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**